# EXHIBIT 1

**STATE OF MINNESOTA**                                     **DISTRICT COURT**

**COUNTY OF RAMSEY**                           **SECOND JUDICIAL DISTRICT**

| | |
|---|---|
| Minnesota Life Insurance Company,<br><br>          Plaintiff,<br><br>vs.<br><br>Matthew F. Strong and<br>Strong Financial Solutions, Inc.,<br><br>          Defendants. | Case Type: Contract<br>Court File No. _____<br><br><br><br>**SUMMONS** |

THIS SUMMONS IS DIRECTED TO THE ABOVE-NAMED DEFENDANTS.

     1. **YOU ARE BEING SUED**. The Plaintiff has started a lawsuit against you. The Plaintiff's Complaint against you is attached to this summons. Do not throw these papers away. They are official papers that affect your rights. You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this summons.

     2. **YOU MUST REPLY WITHIN 21 DAYS TO PROTECT YOUR RIGHTS**. You must give or mail to the person who signed this summons **a written response** called an Answer within 21 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this summons located at 120 South Sixth Street, Suite 1515, Minneapolis, Minnesota 55402.

     3. **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiff's Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

     4. **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not Answer within 21 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the complaint. If you do not want to contest the claims stated in the complaint, you do not need to respond. A default judgment can then be entered against you for the relief requested in the complaint.

     5. **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. **Even if you cannot get legal help, you must still provide a written Answer to protect**

62-CV-22-5535

Filed in District Court
State of Minnesota
10/12/2022 2:01 PM

**your rights or you may lose the case**.

6. **ALTERNATIVE DISPUTE RESOLUTION.** The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

**WARNER LAW, LLC**

DATED: June 2, 2022

*/s/ George E. Warner, Jr.*
George E. Warner, Jr. (#222719)
120 South Sixth Street, Suite 1515
Minneapolis, Minnesota 55402
Telephone: (952) 922-7700

*Attorney for the Plaintiff*

*Plaintiff's Summons and Complaint*
*Minnesota Life Insurance Company v. Matthew F. Strong and Strong Financial Solutions, Inc.*
*Page 2 of 8*

| | |
|---|---|
| **STATE OF MINNESOTA** | **DISTRICT COURT** |
| **COUNTY OF RAMSEY** | **SECOND JUDICIAL DISTRICT** |

| | |
|---|---|
| Minnesota Life Insurance Company, | Case Type: Contract |
| Plaintiff, | Court File No. _____ |
| vs. | |
| Matthew F. Strong and Strong Financial Solutions, Inc., | **COMPLAINT** |
| Defendants. | |

The Plaintiff as and for its Complaint against the Defendants states and alleges as follows:

## THE PARTIES

1.      The Plaintiff Minnesota Life Insurance Company ("**Plaintiff**" or "**Minnesota Life**") is a duly-registered Minnesota corporation presently active and in good standing.

2.      Upon information and belief, the Defendant Matthew F. Strong ("**Mr. Strong**") is a Florida resident and licensed insurance agent. A true and correct copy of the license details page from the National Association of Insurance Commissioners' website is attached hereto as **Exhibit A** and incorporated herein by this reference.

3.      Upon information and belief, the Defendant Strong Financial Solutions, Inc. ("**Strong Financial**") was a Florida corporation that was voluntarily dissolved in 2018. A true and correct copy of the Corporation File Detail Report from the Florida Secretary of State is attached hereto as **Exhibit B** and incorporated herein by this reference.

4.      The above-named Defendants shall collectively be referred to as "**Defendants**."

*Plaintiff's Summons and Complaint*
*Minnesota Life Insurance Company v. Matthew F. Strong and Strong Financial Solutions, Inc.*
*Page 3 of 8*

## JURISDICTION AND VENUE

5.      This Court enjoys subject matter jurisdiction over the claims asserted by reason of Minn. Stat. § 484.01.

6.      This Court enjoys personal jurisdiction over the Defendant and this matter is properly venued in Ramsey County under Minn. Stat. § 542.09 as the Plaintiff's cause of action or some part thereof has arisen in the County of Ramsey, and the Defendant expressly agreed to jurisdiction in Ramsey County under ¶ 4.10 on page four (4) of his Broker Sales Contract, and ¶ 4.10 on page five (5) of his Brokerage General Agency Contract.

## STATEMENT OF THE CASE
## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

7.      On or about March 15, 2013, Mr. Strong entered into a Broker Sales Contract with the Plaintiff.

8.      A true and correct copy of the Broker Sales Contract is attached hereto as **Exhibit C** and incorporated herein by this reference.

9.      On or about January 13, 2014, Strong Financial, through its officer Mr. Strong, entered into a Brokerage General Agency Contract with the Plaintiff.

10.      A true and correct copy of the Brokerage General Agency Contract is attached hereto as **Exhibit D** and incorporated herein by this reference.

11.      The Broker Sales Contract and the Brokerage General Agency Contract shall collectively be referred to as the "**Agreements**."

12.      Under the Agreements, the Defendants were entitled to and did receive significant advance commissions for the sale of insurance products issued by Minnesota Life or its affiliates.

13.      Under the Agreements, if any products sold are later canceled or the transactions otherwise rescinded by the purchasers, the Defendants are then obligated to repay the commissions

*Plaintiff's Summons and Complaint*
*Minnesota Life Insurance Company v. Matthew F. Strong and Strong Financial Solutions, Inc.*
*Page 4 of 8*

received.

14.     The Plaintiff made payment to the Defendants for certain sales, which were later canceled or rescinded.

15.     The Plaintiff made demand for the repayment of the commissions now owed to the Plaintiff.

16.     The Defendants are in default of their obligations under the Agreements with the Plaintiff due to their failure to repay the commissions as agreed.

17.     A true and correct copy of the Plaintiff's correspondence demanding repayment from the Defendants is attached hereto as **Exhibit E**.

18.     A true and correct copy of the Plaintiff's LPM Commission Statement, which is an accounting of sums remaining due to Plaintiff, is attached hereto as **Exhibit F** and incorporated herein by this reference.

19.     The Plaintiff's LPM Commission Statement shows a smaller amount due than the correspondence, as the Defendant's debt to the Plaintiff has been reduced since the correspondence.

20.     The Plaintiff has incurred and will continue to incur attorneys' fees and costs in prosecuting this action.

21.     The Plaintiff brings this action to obtain a money judgment against the Defendants and collect payment for the sums due.

### FIRST CAUSE OF ACTION
### BREACH OF CONTRACT

22.     The preceding paragraphs are incorporated herein as though set forth in full.

23.     Pursuant to the parties' Agreements, the Defendants have an obligation to repay the monies owed to Plaintiff.

24.     The Defendants have breached this obligation by failing to pay the Plaintiff, have

*Plaintiff's Summons and Complaint*
*Minnesota Life Insurance Company v. Matthew F. Strong and Strong Financial Solutions, Inc.*
*Page 5 of 8*

failed to cure this breach, and remain in default of their obligations under the parties' Agreements.

25.     The Plaintiff has been damaged in the principal amount of $267,500.08, plus applicable interest, reasonable attorneys' fees, and costs and disbursements.

## SECOND CAUSE OF ACTION
## ACCOUNT STATED

26.     The preceding paragraphs are incorporated herein as though set forth in full.

27.     From time to time, the Plaintiff made and rendered to the Defendants accurate invoices or statements of account for the transactions between the parties. The Plaintiff's invoices or statements of account were received by the Defendants, accepted by the Defendants, and retained by the Defendants without any objection to any item thereof within a reasonable period of time.

28.     A full, just and true account was made and stated between the Plaintiff and the Defendants, which showed a principal balance of $267,500.08, due to the Plaintiff from the Defendants over and above all sums received from the Defendants and for which the Defendants are entitled to credit.

29.     The account was delivered to, received, accepted, and retained by the Defendants without objection being made to any item thereof within a reasonable time.

30.     Although duly demanded, no part or portion thereof has been paid.

## THIRD CAUSE OF ACTION
## UNJUST ENRICHMENT

31.     The preceding paragraphs are incorporated herein as though set forth in full.

32.     The Defendants received, accepted, and benefited from the services provided by the Plaintiff and for which the Plaintiff has not been fully repaid pursuant to their Agreements with the Defendants.

33.     The Defendants have been unjustly enriched to the detriment of the Plaintiff in the total amount of $267,500.08 plus interest, costs, and fees pursuant to the parties' Agreements.

*Plaintiff's Summons and Complaint*
*Minnesota Life Insurance Company v. Matthew F. Strong and Strong Financial Solutions, Inc.*
*Page 6 of 8*

## FOURTH CAUSE OF ACTION
## BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

34.     The preceding paragraphs are incorporated herein as though set forth in full.

35.     The Defendants expressly and impliedly agreed to obligate themselves to act in good faith and fairly towards the Plaintiff.

36.     The Agreements between the Plaintiff and the Defendants contained an implied covenant of good faith and fair dealing.

37.     The Defendants have breached their duties of good faith and fair dealing to the Plaintiff by failing to honor their agreed-upon obligations and otherwise engaging in a course of conduct directly contrary to the parties' Agreements.

38.     The Defendants' breach of the implied covenant of good faith and fair dealing was arbitrary, unreasonable, and contrary to the reasonable expectations of the parties, and has proximately caused damages to the Plaintiff.

39.     As a direct and proximate result of the Defendants' breach of the implied covenant of good faith and fair dealing, the Plaintiff has and in the future will sustain compensatory and consequential damages, including the costs and expenses of this suit.

## FIFTH CAUSE OF ACTION
## ADDITIONAL AND UNKNOWN CLAIMS

40.     The preceding paragraphs are incorporated herein as though set forth in full.

41.     The Defendants may also be liable for civil conspiracy or other claims which Discovery may establish.

42.     The Plaintiff expressly reserves the right, consistent with the Minnesota Rules of Civil Procedure, to amend this Complaint to include such additional claims as may be uncovered during the litigation process.

*Plaintiff's Summons and Complaint*
*Minnesota Life Insurance Company v. Matthew F. Strong and Strong Financial Solutions, Inc.*
*Page 7 of 8*

## PRAYER FOR RELIEF AND ENTRY OF JUDGMENT

**WHEREFORE**, the Plaintiff demands judgment from the Court against the Defendants, jointly and severally, as follows:

1.      For judgment in an amount in excess of $267,500.08;

2.      For judgment against the Defendants for the payment of all the Plaintiff's costs, expenses, attorneys' fees, and all applicable pre- and post-judgment interest as appropriate by law or agreement; and

3.      For such other and further relief as the Court shall deem just and equitable.

**WARNER LAW, LLC**

DATED: June 2, 2022                     */s/ George E. Warner, Jr.*
George E. Warner, Jr. (#222719)
1515 Canadian Pacific Plaza
120 South Sixth Street
Minneapolis, Minnesota 55402
Telephone: (952) 922-7700

*Attorney for the Plaintiff*

## ACKNOWLEDGMENT

Attorney George E. Warner, Jr., by signing above, acknowledges that costs, disbursements, witness fees, and reasonable attorney's fees may be awarded, pursuant to Minnesota Statute § 549.211, for a party acting in bad faith or asserting a frivolous claim.

*Plaintiff's Summons and Complaint*
*Minnesota Life Insurance Company v. Matthew F. Strong and Strong Financial Solutions, Inc.*
Page 8 of 8

DocuSign Envelope ID: D44210CE-5CFE-4663-9EEF-F801FC92B293

62-CV-22-5535

CASE 0:22-cv-02718-MJD-TNL   Doc. 1-1   Filed 10/27/22   Page 10 of 46

Filed in District Court
State of Minnesota
10/12/2022 2:01 PM

**STATE OF MINNESOTA**　　　　　　　　　　　　**DISTRICT COURT**

**COUNTY OF RAMSEY**　　　　　　　　　**SECOND JUDICIAL DISTRICT**

---

| | |
|---|---|
| Minnesota Life Insurance Company,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>Matthew F. Strong and<br>Strong Financial Solutions, Inc.,<br><br>　　　　　Defendants. | Case Type: Contract<br>Court File No. _____<br><br><br>**CREDITOR'S AFFIDAVIT AND<br>VERIFICATION** |

---

STATE OF MINNESOTA　　　)
　　　　　　　　　　　　　　) ss.
COUNTY OF HENNEPIN　　　)

　　　1.　　　I am an agent of the Plaintiff who is duly authorized to make this Affidavit on their behalf.

　　　2.　　　I have read the Plaintiff's Complaint. I believe that all the facts contained in it are true to the best of my knowledge, information, and belief formed after reasonable inquiry.

　　　3.　　　I believe the Complaint is well-grounded in fact and warranted by existing law or by good faith argument for the extension, modification, or reversal of existing law. The Plaintiff's Complaint is not being interposed for any improper purpose.

　　　4.　　　I am familiar with the Plaintiff's business records related to the Defendants and specifically those documents attached to the Plaintiff's Complaint as Exhibits.

　　　5.　　　The Complaint's Exhibits are true and correct copies of the Plaintiff's business books and records; or are computer records derived thereof, which were generated or maintained by the Plaintiff in the ordinary course of business.

　　　6.　　　The amounts shown on these records are presently due and owing from the

*Creditor's Affidavit and Verification*
*Minnesota Life Insurance Company v. Matthew F. Strong and Strong Financial Solutions, Inc.*
Page 1 of 2

62-CV-22-5535

DocuSign Envelope ID: D44210CE-5CFE-4663-9EEF-F301FC82B293

CASE 0:22-cv-02718-MJD-TNL   Doc. 1-1   Filed 10/27/22   Page 11 of 46

Filed in District Court
State of Minnesota
10/12/2022 2:01 PM

Defendants to the Plaintiff. The Defendants have been given full credit for all payments made, all deductions due, and any lawful setoffs to which the Defendants are entitled.

7.      I also have personal knowledge of the calculation of the amounts due from the Defendants, and I personally participated in the preparation of that calculation in connection with this affidavit.

8.      Pursuant to the Agreements between the Plaintiff and the Defendants, the Defendants expressly agreed to reimburse the Plaintiff for any costs of collection, including attorneys' fees, incurred by the Plaintiff in connection with the Defendants' failure to honor the Agreements.

9.      As a direct result of the Defendants' failure to pay as agreed, the Plaintiff was forced to hire counsel and commence this present action. There presently remains due and owing from the Defendants to the Plaintiff the principal sum of $267,500.08.

10.     The law firm of Warner Law, LLC is authorized to commence a lawsuit against the Defendants and initiate post-judgment creditors' remedies if and when judgment is obtained. The Plaintiff has not received, and has no knowledge of, any notice that a Bankruptcy Petition has been filed by or against the Defendants.

11.     Under the provisions of Minn. Stat. § 358.116 and Minnesota General Rules of Practice 14 and 15(b), I declare under penalty of perjury that everything I have stated in this document is true and correct.

Executed on: _____
6/2/2022 | 1:17:37 PM PDT
                (Date)

DocuSigned by:

*Kristin Ferguson*
0429D0464DD04C8...
Signature

Kristin Ferguson
_____
Printed Name

Vice President, CFO, and Actuary
_____
Title

*Creditor's Affidavit and Verification*
*Minnesota Life Insurance Company v. Matthew F. Strong and Strong Financial Solutions, Inc.*
*Page 2 of 2*

# **EXHIBIT A**

Filed in District Court
State of Minnesota
10/12/2022 2:01 PM



# Licensee Search

# Licensee Detail

**License #:**

P002135

**Full Name:**

STRONG, MATTHEW FRED

**Business Address:**

2598 E SUNRISE BLVD STE 2104
FORT LAUDERDALE, FL 333043230

**Mailing Address:**

2200 NE 33RD AVE APT 9K
FORT LAUDERDALE, FL 333051878

**Email:**

MATT@STRONGRG.COM

**Phone:**

(954) 440-5588

**County:**

Broward

**NPN #:**

3898640

## Continuing Education Statistics

|  |  |
|---|---|
| **CE Due Date:** | 1/31/2024 |
| **Continuing Education Status:** | In Progress |
| **Number of Hours Required:** | 24 |
| **Number of Hours Completed:** | 4 |

**Valid Licenses**

Copyright © Florida Department of Financial Services 2018

Filed in District Court
State of Minnesota
10/12/2022 2:01 PM

| Type | Issue Date | Qualifying Appointment |
|---|---|---|
| LIFE INCL VAR ANNUITY & HEALTH (0215) | 8/5/2020 | YES |

## Active Appointments

### LIFE INCL VARIABLE ANNUITY (0214)

| Company Name | Issue Date | Exp Date |
|---|---|---|
| ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA | 6/22/2021 | 1/31/2024 |

### LIFE INCL VAR ANNUITY & HEALTH (0215)

| Company Name | Issue Date | Exp Date |
|---|---|---|
| ATHENE ANNUITY AND LIFE COMPANY | 4/15/2021 | 1/31/2024 |
| AMERICO FINANCIAL LIFE AND ANNUITY INSURANCE COMPANY | 11/16/2020 | 1/31/2023 |
| GUARANTY INCOME LIFE INSURANCE COMPANY | 2/11/2021 | 1/31/2024 |
| SECURITY BENEFIT LIFE INSURANCE COMPANY | 5/6/2022 | 1/31/2025 |

### LIFE (0216)

| Company Name | Issue Date | Exp Date |
|---|---|---|
| AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY | 5/7/2021 | 1/31/2024 |
| SAGICOR LIFE INSURANCE COMPANY | 3/10/2021 | 1/31/2024 |
| OCEANVIEW LIFE AND ANNUITY COMPANY | 2/9/2021 | 1/31/2024 |
| COLUMBUS LIFE INSURANCE COMPANY | 2/7/2022 | 1/31/2025 |
| AMERICAN NATIONAL INSURANCE COMPANY | 2/1/2021 | 1/31/2024 |
| NASSAU LIFE AND ANNUITY COMPANY | 10/6/2021 | 1/31/2024 |

## Invalid Licenses

| Type | Issue Date | Status |
|---|---|---|
| LIFE INCL VAR ANNUITY & HEALTH (0215) | 10/7/2011 | INVALID |

Licensee Detail 62-CV-22-5535 https://licenseesearch.fldfs.com/Licensee/702983

CASE 0:22-cv-02718-MJD-TNL  Doc. 1-1  Filed 10/27/22  Page 15 of 46 Filed in District Court
State of Minnesota
10/12/2022 2:01 PM

| | | |
|---|---|---|
| NONRES LIFE & VARIABLE ANNUITY (0814) | 2/23/2019 | INVALID |
| NONRES LIFE, HEALTH, & VAR ANN (0815) | 9/12/2005 | INVALID |
| NONRESIDENT HEALTH (0840) | 2/23/2019 | INVALID |

## Inactive Appointments

### LIFE INCL VAR ANNUITY & HEALTH (0215)

| Company Name | Issue Date | Exp Date | Status Date |
|---|---|---|---|
| PIONEER AMERICAN INSURANCE COMPANY | 11/8/2013 | 1/31/2016 | 1/25/2016 |
| ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA | 11/12/2013 | 1/31/2018 | 11/7/2017 |
| HUMANA INSURANCE COMPANY | 9/12/2013 | 1/31/2016 | 4/23/2015 |
| KANAWHA INSURANCE COMPANY | 9/12/2013 | 1/31/2016 | 4/23/2015 |
| HUMANA HEALTH INSURANCE COMPANY OF FLORIDA, INC. | 9/12/2013 | 1/31/2016 | 4/23/2015 |
| ZURICH AMERICAN LIFE INSURANCE COMPANY | 9/14/2017 | 1/31/2020 | 11/7/2017 |
| SYMETRA LIFE INSURANCE COMPANY | 7/5/2017 | 1/31/2020 | 11/7/2017 |
| MIDLAND NATIONAL LIFE INSURANCE COMPANY | 11/7/2011 | 1/31/2014 | 3/22/2012 |
| LINCOLN NATIONAL LIFE INSURANCE COMPANY | 10/9/2011 | 1/31/2018 | 11/7/2017 |
| AMERICAN GENERAL LIFE INSURANCE COMPANY | 12/12/2016 | 1/31/2019 | 11/7/2017 |
| BANNER LIFE INSURANCE COMPANY | 3/22/2013 | 1/31/2018 | 11/7/2017 |
| MINNESOTA LIFE INSURANCE COMPANY | 3/19/2013 | 1/31/2018 | 11/7/2017 |
| SENTINEL SECURITY LIFE INSURANCE COMPANY | 5/9/2013 | 1/31/2016 | 1/29/2016 |

### LIFE (0216)

| Company Name | Issue Date | Exp Date | Status Date |
|---|---|---|---|
| SENIOR LIFE INSURANCE COMPANY | 2/17/2014 | 1/31/2017 | 8/4/2014 |
| EQUITRUST LIFE INSURANCE COMPANY | 9/9/2014 | 1/31/2019 | 11/7/2017 |

62-CV-22-5535

https://licenseesearch.fldfs.com/Licensee/70298

CASE 0:22-cv-02718-MJD-TNL   Doc. 1-1   Filed 10/27/22   Page 16 of 46

Filed in District Court
State of Minnesota
10/12/2022 2:01 PM

| Company Name | | | |
| --- | --- | --- | --- |
| SECURITY BENEFIT LIFE INSURANCE COMPANY | 8/10/2020 | 1/31/2023 | 5/6/2022 |
| NATIONAL WESTERN LIFE INSURANCE COMPANY | 3/16/2017 | 1/31/2020 | 11/7/2017 |
| ATHENE ANNUITY AND LIFE COMPANY | 12/15/2011 | 1/31/2018 | 11/7/2017 |
| MASSMUTUAL ASCEND LIFE INSURANCE COMPANY | 4/16/2012 | 1/31/2017 | 12/27/2016 |
| SAGICOR LIFE INSURANCE COMPANY | 3/20/2012 | 1/31/2015 | 5/16/2013 |
| NORTH AMERICAN COMPANY FOR LIFE AND HEALTH INSURANCE | 4/25/2013 | 1/31/2018 | 7/21/2016 |
| GUGGENHEIM LIFE AND ANNUITY COMPANY | 6/24/2015 | 1/31/2018 | 11/7/2017 |
| BANNER LIFE INSURANCE COMPANY | 7/20/2016 | 1/31/2019 | 11/7/2017 |
| SECURITY BENEFIT LIFE INSURANCE COMPANY | 10/24/2011 | 1/31/2018 | 11/7/2017 |
| AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY | 1/12/2012 | 1/31/2018 | 1/3/2017 |
| FIDELITY & GUARANTY LIFE INSURANCE COMPANY | 1/29/2015 | 1/31/2019 | 11/7/2017 |
| FIDELITY & GUARANTY LIFE INSURANCE COMPANY | 12/3/2020 | 1/31/2023 | 4/25/2022 |

## LIFE & HEALTH (0218)

| Company Name | Issue Date | Exp Date | Status Date |
| --- | --- | --- | --- |
| NATIONWIDE LIFE AND ANNUITY INSURANCE COMPANY | 4/8/2015 | 1/31/2018 | 11/7/2017 |
| AMERICAN NATIONAL INSURANCE COMPANY | 9/14/2014 | 1/31/2019 | 11/7/2017 |
| 5 STAR LIFE INSURANCE COMPANY | 3/19/2013 | 1/31/2016 | 10/1/2015 |

## HEALTH (0240)

| Company Name | Issue Date | Exp Date | Status Date |
| --- | --- | --- | --- |
| HUMANADENTAL INSURANCE COMPANY | 9/12/2013 | 1/31/2016 | 8/6/2014 |
| HUMANA MEDICAL PLAN, INC. | 9/12/2013 | 1/31/2016 | 4/23/2015 |
| HUMANA ADVANTAGECARE PLAN, INC. | 9/12/2013 | 1/31/2016 | 10/10/2014 |
| COMPBENEFITS COMPANY | 9/12/2013 | 1/31/2016 | 4/23/2015 |

Filed in District Court
State of Minnesota
10/12/2022 2:01 PM

### NONRES LIFE & VARIABLE ANNUITY (0814)

| Company Name | Issue Date | Exp Date | Status Date |
|---|---|---|---|
| SECURITY BENEFIT LIFE INSURANCE COMPANY | 7/16/2020 | 1/31/2023 | 8/5/2020 |
| JACKSON NATIONAL LIFE INSURANCE COMPANY | 3/1/2006 | 1/31/2013 | 10/7/2011 |

### NONRES LIFE, HEALTH, & VAR ANN (0815)

| Company Name | Issue Date | Exp Date | Status Date |
|---|---|---|---|
| LINCOLN NATIONAL LIFE INSURANCE COMPANY | 8/19/2008 | 1/31/2013 | 10/7/2011 |
| NATIONAL WESTERN LIFE INSURANCE COMPANY | 6/13/2011 | 1/31/2014 | 10/7/2011 |

### NONRESIDENT LIFE (0816)

| Company Name | Issue Date | Exp Date | Status Date |
|---|---|---|---|
| SECURITY BENEFIT LIFE INSURANCE COMPANY | 6/23/2011 | 1/31/2014 | 10/7/2011 |
| ATHENE ANNUITY AND LIFE COMPANY | 7/28/2010 | 1/31/2013 | 10/7/2011 |

# **EXHIBIT B**

Detail by Entity Name

62-CV-22-5535

CASE 0:22-cv-02718-MJD-TNL   Doc. 1-1   Filed 10/27/22   Page 19 of 46

Filed in District Court
State of Minnesota
10/12/2022 2:01 PM

DIVISION OF CORPORATIONS



## Detail by Entity Name

Florida Profit Corporation
STRONG FINANCIAL SOLUTIONS,INC.

**Filing Information**

| | |
|---|---|
| **Document Number** | P11000093029 |
| **FEI/EIN Number** | ▮▮▮▮▮▮ |
| **Date Filed** | 10/24/2011 |
| **Effective Date** | 12/14/2007 |
| **State** | FL |
| **Status** | INACTIVE |
| **Last Event** | VOLUNTARY DISSOLUTION |
| **Event Date Filed** | 04/06/2018 |
| **Event Effective Date** | 04/07/2018 |

**Principal Address**

711 Ashgrove Terrace
Sanford, FL 32771

Changed: 01/03/2017

**Mailing Address**

711 Ashgrove Terrace
Sanford, FL 32771

Changed: 01/03/2017

**Registered Agent Name & Address**

STRONG, MATTHEW F
711 Ashgrove Terrace
Sanford, FL 32771

Address Changed: 01/03/2017

**Officer/Director Detail**

**Name & Address**

Title President, CEO

STRONG, MATTHEW F
12624 Tattersall Park Lane
Tampa, FL 33625

Detail by Entity Name                                    62-CV-22-5536 //search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?

CASE 0:22-cv-02718-MJD-TNL   Doc. 1-1   Filed 10/27/22   Page 20 of 46

Filed in District Court
State of Minnesota
10/12/2022 2:01 PM

**Annual Reports**

| Report Year | Filed Date |
|---|---|
| 2015 | 03/06/2015 |
| 2016 | 03/28/2016 |
| 2017 | 01/03/2017 |

**Document Images**

| | |
|---|---|
| 01/03/2017 -- ANNUAL REPORT | View image in PDF format |
| 03/28/2016 -- ANNUAL REPORT | View image in PDF format |
| 03/06/2015 -- ANNUAL REPORT | View image in PDF format |
| 04/24/2014 -- ANNUAL REPORT | View image in PDF format |
| 10/18/2013 -- Amendment and Name Change | View image in PDF format |
| 04/22/2013 -- ANNUAL REPORT | View image in PDF format |
| 04/24/2012 -- ANNUAL REPORT | View image in PDF format |
| 10/24/2011 -- Domestic Profit | View image in PDF format |

Florida Department of State, Division of Corporations

Filed in District Court
State of Minnesota
10/12/2022 2:01 PM

# EXHIBIT C

62-CV-22-5535

Filed in District Court
State of Minnesota
10/12/2022 2:01 PM

## Broker Sales Contract
(Fixed Products)

**Minnesota Life Insurance Company** - A Securian Company
400 Robert Street North ● St. Paul, Minnesota 55101-2098

**MINNESOTA LIFE**

### Section 1. AUTHORITY

Minnesota Life Insurance Company (We, Us, Our) hereby contracts with and agrees to appoint the individual or entity named on the signature page (You, Your) as a Broker. This Broker Sales Contract ("Contract") is effective on the date We determine, as indicated herein.

**1.1** You agree:

(a) To solicit and procure applications for Our fixed products as listed on any commission schedule in effect and made a part of this Contract, but, in any state that requires appointment, You may not solicit an application for Our products before You are appointed by us in that state;

(b) To remit all applications and any initial premiums promptly to the agency that executed a "Request to Appoint" form on your behalf ("Agency") or as otherwise instructed by Us;

(c) To deliver all issued products promptly to the contract owner in accordance with any delivery instructions;

(d) To provide service to product owners of Our products;

(e) To obtain and keep in good standing all appropriate licenses necessary to solicit applications as authorized under this Contract.

(f) To promote Us or Our products by using only marketing materials that are approved by Us. For purposes of this provision, "marketing materials" means all written, and pictorial materials designed to reach the public (including but not limited to brochures, newsletters, letters, presentations, proposals, web pages, phone scripts, illustrations, business cards, letterhead, mailing or e-mailings) which contain Our signature package (logo), reference Us or Our products, or mention Our name.

**1.2** We agree to compensate You as provided in this Contract.

### Section 2. COMPENSATION

**2.1** COMMISSIONS

(a) Your compensation consists of commissions on products You sell. We will pay commissions as We receive premiums in cash, subject to Our established practices in effect at the time. We may pay commissions directly to You or to the broker-dealer with whom you are registered ("Your Broker-Dealer") if so required by Your Broker-Dealer. It is Your responsibility to inform Us in writing if Your commissions must be paid to Your Broker-Dealer. Commissions paid to Your Broker-Dealer will be governed by agreements between Us and Your Broker-Dealer, and any such payment will be Your Broker-Dealer's sole responsibility. In all cases involving a dispute or questionable commission claim, Our decision shall be binding and conclusive. For income and other tax reporting purposes, We will report all income paid directly by Us to You under this Contract;

(b) We will calculate compensation under this Contract according to the applicable Brokerage Commission Schedule in effect for you on the date compensation is to be first paid to You for a particular policy. The Brokerage Commission Schedule in effect on the date that compensation is first paid for a policy shall apply to all compensation paid on that policy throughout the life of the policy. Your initial Brokerage Commission Schedule is attached as Schedule 1. Whenever a new Brokerage Commission Schedule is issued, it will become a part of this Contract. Except as expressly stated in each new Brokerage Commission Schedule, the rates, schedules and other information in the new Brokerage Commission Schedule shall become effective during the first full calendar week following the issuance of the new Brokerage Commission Schedule. We will either communicate it to You or post it on Our website accessible to You;

F72418 Rev 5-2010

(Page 8 of 22)

62-CV-22-5535

CASE 0:22-cv-02718-MJD-TNL   Doc. 1-1   Filed 10/27/22   Page 23 of 46

Filed in District Court
State of Minnesota
10/12/2022 2:01 PM

(c) We will pay all compensation which is due you under this Contract on and after the date of your death, to the duly appointed representative of your estate; and

(d) We have the right to refund any premiums paid on a policy if We believe this is proper where a policy is rescinded, cancelled, or not accepted, or for any other reason We believe is proper. You agree to return to Us, when We ask for it, all earnings which We credited to You on any premiums which We refund.

## 2.2 COMPENSATION AFTER TERMINATION

Should either You or We terminate this Contract, compensation for products in force after termination will be payable as follows:

(a) If You are terminated for reasons other than reasons that qualify as Prohibited Acts under paragraph 4.6(c), commissions as described in Section 2.1 will continue to be paid as if this Contract were still in force on products sold before termination by You. Notwithstanding the foregoing, if after Your termination You participate in the conduct described in paragraph 4.6(c)(1), 4.6(c)(4) or 4.6(c)(5), We, at Our option, may declare this Contract null and void, and all Your rights, benefits, and compensation (according to Section 2.1 COMMISSIONS) shall be forfeited;

(b) If termination is with cause and You have done any of the Prohibited Acts as defined in Section 4.6(c), We, at Our option, may declare this Contract null and void, and all Your rights, benefits, and compensation from Us (according to Section 2.1 COMMISSIONS) shall be forfeited.

## 2.3 ADJUSTMENTS

(a) RETURNED PREMIUMS.
All compensation paid to You as provided in Section 2.1 under the applicable Brokerage Commission Schedule, on any premiums that are subsequently returned or otherwise not received by Us shall, upon Our demand, become a debt You owe to Us, payable according to paragraph 2.3(b) FIRST CLAIM ON EARNINGS; and

(b) FIRST CLAIM ON EARNINGS. You agree to promptly repay all debts to Us, including reasonable interest as We determine. We have first claim on all of Your earnings earned through Us. This means that, as and when elected, We may keep all or any part of Your earnings to reduce any debt You owe Us. While We may release Your earnings while You owe Us a debt, this does not mean We have waived this right of first claim to Your earnings. We may make this claim whether Your earnings are due You, the representative of Your estate, Your heirs or Your assignees. Our claim also takes precedence over claims of Your creditors. All Your earnings We keep will be used to reduce the debt you owe Us.

## Section 3.   ETHICAL STANDARDS

We require You to pledge to conduct business according to the highest principles of honesty, integrity and pride, always putting the needs of the customer first:

**3.1** To conduct a thorough interview to determine the customer's needs and clearly disclose when products are being proposed as part of a sale presentation;

**3.2** To ensure that the customer understands the costs and benefits of any product or proposal;

**3.3** To distinguish clearly between the guaranteed and non-guaranteed elements of any product or proposal, and make the customer aware of product conditions or limitations, and of any features that could change over time;

**3.4** To satisfy all state and federal disclosures, including requirements relating to compensation, recognizing that appropriate disclosures are one of Your fundamental duties when acting on behalf of Your customer; and

**3.5** To treat all customers as You would want to be treated, and to maintain personal and professional conduct that enhances Your reputation and Our reputation.

## Section 4.   GENERAL PROVISIONS

**4.1** STATUS. You are not Our employee under this Contract. You are an independent contractor using Your own judgment and

(Page 9 of 22)

62-CV-22-5535

CASE 0:22-cv-02718-MJD-TNL   Doc. 1-1   Filed 10/27/22   Page 24 of 46

Filed in District Court
State of Minnesota
10/12/2022 2:01 PM

guidelines in performing under the terms of this Contract. We shall not determine the place or time that You perform Your duties as a broker under this Contract, and nothing contained in this Contract shall limit Your right to sell products on behalf of other insurance companies. You are responsible for paying all expenses You incur in carrying out the terms of the Contract.

As a broker, You are not a full-time salesperson for Us. Therefore You are not eligible for any fringe benefit plans in which Your participation or Our contributions are in any way dependent on Your being considered a statutory or common law employee. We will not pay any social security or related taxes on Your commissions or other compensation.

**4.2** ACTS NOT AUTHORIZED. Your authority extends no further than is specifically stated in this Contract and, except as expressly set forth herein, You shall have no power or authority to act on Our behalf. Specifically, but not limited to the following, You are not authorized:

(a) To offer for sale, in Our name, any products not included on the attached Brokerage Commission Schedule. However, this shall not affect Your ability to sell products on behalf of other insurance companies. The Brokerage Commission Schedule shall be amended by updates to the Brokerage Commission Schedule, without amending this Contract;

(b) To make, alter, or discharge contracts in Our name, or guarantee any illustrations;

(c) To incur any debt or liability for or against Us, institute any legal proceedings, or bind Us in any manner whatsoever;

(d) To accept any money or property on Our behalf, except for first premiums on Our products;

(e) To create or use any advertisement (all written and pictorial materials designed to reach the public, including but not limited to brochures, newsletters, letters, presentations, proposals, web pages, phone scripts, illustrations, business cards, letterhead, mailing or e-mailings) containing Our signature package (logo), referencing Us or Our products, or mentioning Our name unless (1) it has first been approved by Us in writing, and (2) a copy of the final version has been received by Our home office before it is used, and (3) it is used

in accordance with any conditions and limitations of said approval.

**4.3** FIDELITY BOND AND INDEMNITY AGREEMENT. You are not covered under Our fidelity bond. Notwithstanding any fidelity bond, You agree to indemnify and hold Us harmless against any damages or losses which We incurred as a result of Your actions or the actions of individuals working for You or on Your behalf.

**4.4** ERRORS AND OMISSIONS INSURANCE COVERAGE. Before soliciting applications for Us, You agree to provide written proof to Us of Your errors and omissions insurance coverage, of a form and type of coverage and an amount satisfactory to Us. You agree that this coverage shall include You and Your applicable administrative staff. You further agree to keep this required insurance coverage in force and to provide Us periodic proof of said coverage for as long as You are appointed by Us.

**4.5** CLAIMS AGAINST YOU OR US. You agree to provide timely notice to Us and any applicable errors and omissions insurance carriers of any claim against Us, You, or any individual working for You or on Your behalf where said claim is in any way related to the sale of Our products. You agree to cooperate with these carriers. To the extent full coverage by any errors and omissions carriers is not extended to You, or individuals working for You or on Your behalf, or to Us, We have the right to defend said claim, and settle that claim, when We receive satisfactory proof of the merit of that claim. You will be liable to Us and agree to reimburse Us fully for any payments made and any related expenses incurred by Us in the defense and settlement of any such claim that We defend, pay or settle, including costs of counsel employed for such action.

**4.6** TERMINATION. This Contract can be terminated either without cause or with cause.

(a) Without Cause. Your Contract can be terminated, without cause and without a reason being given, at any time by You or Us. The party who wants to terminate this Contract without cause must give 15 days' written notice to the other party to the Contract. This Contract will terminate as of 11:59 p.m. on the 15th day following the date on which the notice

was given. Upon mutual written agreement of the parties, the 15 day notice period may be waived.

(b) With Cause. Your Contract can be terminated for cause at any time by Us, in Our sole discretion. We must state the cause in writing to You. This Contract will terminate as soon as the written notice is given. Reasons may include, but are not limited to, Your failure: to maintain a necessary license; to comply with an insurance or securities law or regulation; to comply with Our rules or procedures; or to comply with a term of this Contract.

(c) Forfeiture. Except as otherwise provided by law, if (1) Your Contract is terminated for cause; and (2) You also do (or You cause or allow any individuals working for You or on Your behalf to do) any of the conduct listed below (the "Prohibited Acts"), We, at Our option, may declare this Contract null and void, and all Your rights, benefits, and compensation from Us (according to Section 2.1 COMMISSIONS) shall be forfeited:

(1) Withhold or misappropriate any funds, documents, or property belonging to an owner of one of Our products, or to a person whose application for a product has not been accepted by Us;

(2) Knowingly provide false information on the applicant's application;

(3) Provide false information in Your application to contract with Us;

(4) Induce any owner of one of Our products to lapse or surrender the product or replace it with another company's product without Our consent, whether or not applicable replacement laws or regulations have been followed;

(5) Induce or attempt to induce one of Our agents to leave Us; or

(6) Violate any state or federal insurance or securities law.

(d) Nothing herein shall affect Our right to assert any other claim, either in law or in equity, We may have or acquire against You.

(e) Termination of this Contract shall not affect Your obligation to repay any debt to Us or to account for and return all funds, products, training or sales material, and Our other property to Our satisfaction.

**4.7** ASSIGNMENT. We are relying on Your specific abilities in the performance of the obligations and duties under this Contract. Therefore, neither this Contract nor any of the rights, obligations or duties under this Contract may be assigned by You without Our prior written approval, which approval maybe withheld in Our sole discretion.

**4.8** WAIVER. The failure of either party to exercise any right or enforce any provision of this Contract shall not be construed as a waiver of that party's right to subsequently exercise that right or enforce that provision.

**4.9** AMENDMENT OF CONTRACT. We reserve the right to amend any part of this Contract upon notice to You. Any amendment will be effective thirty days from the communication of such amendment, or earlier by mutual written agreement, but no such amendment shall affect compensation payable on products previously put in force, except by mutual written agreement. Neither this Contract nor any amendment to it shall bind Us unless signed by Our officer. We reserve the unilateral right to change or revise any part of the Brokerage Commission Schedule at any time. The commission calculations stated in any Brokerage Commission Schedule, however, shall continue to apply until We communicate changes to You or post them on Our website accessible to You. Brokerage Commission Schedules shall be exempt from the officer signature and notice requirements.

**4.10** GOVERNING LAW. This Contract is governed by the laws of the State of Minnesota. Any litigation arising between the parties with respect to this Contract shall be conducted in Ramsey County, Minnesota.

**4.11** ANTI-MONEY LAUNDERING. You shall comply with Our anti-money laundering policy, and, if requested, You shall assist in satisfying Our obligations under Our anti-money laundering policy.

Filed in District Court
State of Minnesota
10/12/2022 2:01 PM

**4.12** JURISDICTION. We may make such changes and decisions as We deem advisable in the conduct of Our business, including but not limited to discontinuance of any policy form or withdrawal of product sales from any jurisdiction, and We shall incur no liability to You by reason of doing so.

**4.13** EXHIBITS & SCHEDULES. The Exhibits and the Schedules to this Contract that are specifically referred to herein are a part of this Contract as if fully set forth herein. All references herein to Articles, Sections, subsections, paragraphs, subparagraphs, clauses, Exhibits and Schedules shall be deemed references to such parts of this Contract, unless the context shall otherwise require. Any fact or item disclosed on any Schedule to this Contract shall be deemed disclosed on all other Schedules to this Contract to which such fact or item may apply.

**4.14** SURVIVAL. The provisions of Sections 2.2, 2.3, 4.6, 4.12, 5, 6, and 7 shall survive a termination of this Contract.

**Section 5.** MAINTAINING CONFIDENTIALITY OF PERSONAL INFORMATION

All capitalized terms used in this section and not otherwise defined shall have the meanings set forth in regulations issued pursuant to Section 504 of the Gramm-Leach-Bliley Act (15 U.S.C. 6801 et. seq). In connection with Your performance under this Contract, You may have access to Nonpublic Personal Information concerning Our customers (Customer Information). With respect to Customer Information You agree as follows:

**5.1** Nonpublic Personal Information that You acquire in connection with Your performance under this Contract is and remains Our property.

**5.2** You are not authorized to use or disclose Customer Information for any purpose other than to fulfill Your obligations under this Contract. However, You may disclose Customer Information (a) to employees of Minnesota Life, (b) to Your employees, subcontractors and agents who have a business need for access, (c) as authorized by Us in writing, and (d) as required by law or court order. You will notify Us promptly upon becoming aware of any such court order, and will cooperate with Us in contesting such order.

**5.3** You shall store Customer Information in a secure manner and shall use the same degree of care to prevent unauthorized and improper disclosure, as You use in protecting Your own confidential information.

**5.4** You agree and represent that You have implemented appropriate measures designed to:

(a) Ensure the security and confidentiality of Customer Information;

(b) Protect against any anticipated threats or hazards to the security or integrity of the information; and

(c) Protect against unauthorized access to or use of the information that could result in substantial harm or inconvenience to any Minnesota Life customer.

**5.5** You agree to promptly notify Us if You, (a) receive any type of complaint or notice concerning violation of privacy rights, or (b) becomes aware of any unauthorized disclosure, acquisition or use of Customer Information. You shall cooperate with Us in investigating and responding to such incidents.

**5.6** You agree to indemnify us for any and all claims, fines, damages and costs, including attorneys' fees, which may be incurred or assessed against Us as a result of breach of Your obligation of confidentiality.

**5.7** Your obligation to maintain the security and confidentiality of Our Customer Information and to comply with the provisions of the Gramm-Leach-Bliley Act shall survive termination of Your relationship with Minnesota Life.

**5.8** We shall have the right to audit You for compliance with the provisions of this Section.

**Section 6.** MASSACHUSETTS DATA SECURITY LAW

In connection with Your performance under this Contract, You may have access to Personal Information as that term is defined in Massachusetts Regulation 201 CMR 17.02. As required by 201 CMR 17:00: Standards for the Protection of Personal Information of Residents of the Commonwealth, You shall implement and maintain appropriate security measures for Personal Information.

F72418 Rev 5-2010

**Section 7.** HIPAA BUSINESS ASSOCIATE
AGREEMENT

In connection with Your performance under this
Contract, You are or may be deemed to be our
Business Associate. Business Associates, on behalf
of Covered Entity, perform or assist in the
performance of functions and activities that may
involve the use and disclosure of Protected Health
Information as defined in the Health Insurance
Portability and Accountability Act of 1996 ("HIPAA"),
Parts 160 and 164 ("Privacy Regulations"). This
Agreement shall be effective with respect to the use
of information which is protected health information
within the meaning of the Health Insurance
Portability and Accountability Act and its
implementing regulations at 45 C.F.R. parts160 and
164 (the "Federal Health Privacy Rules").

**7.1** Definitions as applied to this Section (Any
prospective amendment to the laws referenced
in this definitional section prospectively amend
this agreement to incorporate said changes by
Congressional act or by regulation of the
Secretary of HHS.)

(a) Breach. "Breach" has the same meaning as
this term has in §13400 of the HITECH Act.
(b) Business Associate. "Business Associate"
shall mean You.
(c) Covered Entity. "Covered Entity" shall
mean Minnesota Life Insurance Company.
(d) Designated Record Set. "Designated
Record Set" has the same meaning as this
term has in 45 CFR §164.501.
(e) Electronic Protected Health Information.
"Electronic Protected Health Information"
means Protected Health Information that
is maintained in or transmitted by
electronic media.
(f) Electronic Health Record. "Electronic
Health Record" shall have the meaning
given to such term in the HITECH Act.
(g) Individual. "Individual" has the same
meaning as this term has in 45 CFR
§164.501.
(h) Privacy Rule. "Privacy Rule " shall mean
the Standards for Privacy of Individually
Identifiable Health Information at 45 CFR
Part 160 and Part 164, Subparts A and E.,
as amended by the HITECH Act.
(i) Protected Health Information. "Protected
Health Information" (or "PHI") has the
same meaning as this term has in 45 CFR
§160.103 (as amended by the HITECH Act),
limited to the information created or
received by Business Associate from or
on behalf of Covered Entity. Protected
Health Information includes Electronic
Protected Health Information.

(j) Required By Law - "Required By Law" has
the same meaning as this term has in 45 CFR
§164.501.
(k) Secretary - "Secretary" shall mean the
Secretary of the U.S. Department of Health
and Human Services or his designate.I)
(l) Security Rule - "Security Rule" means the
Security Standards for Protection of Personal
Health Information promulgated by the
Secretary in Title 45 C.F.R.
(m) Unsecured Protected Health Information -
"Unsecured Protected Health Information"
shall mean Protected Health Information
(PHI) that is not secured through the use of a
technology or methodology specified by the
Secretary in regulations or as otherwise
defined in the §13402(h) of the HITECH Act.

**7.2** Obligations of Business Associate

(a) Permitted Uses and Disclosures. Business
Associate agrees not to use or disclose PHI
except for the performance of the Business
Associate's obligations under the
Agreement pursuant to which Business
Associate performs services for Covered
Entity.
(b) Minimum Necessary. Business Associate
(and its agents or subcontractors) shall
request, use and disclose only the
minimum amount of PHI necessary to
accomplish the purpose of the request, use
or disclosure.
(c) Specific Use or Disclosure. Business
Associate may use or disclose PHI to
perform functions, activities, or services
for, or on behalf of, Covered Entity and as
permitted or required by this Agreement or
the Privacy Regulations.

Business Associate may use or disclose
PHI for the proper management and
administration of its business or to carry
out its legal responsibilities.

Business Associate may disclose PHI for
the proper management and administration
of its business, if (i.) the disclosures are
Required by Law, or (ii.) Business
Associate obtains reasonable assurances
from the person to whom the information is
disclosed that the information will be held
confidentially and will be used or further
disclosed only as required by law or for the
purpose for which it was disclosed to such
person, and the person will notify the
Business Associate of any instances of
which the person is aware in which the
confidentiality of the information has been
breached.

- 6 -

Business Associate may use PHI to provide Data Aggregation services to Covered Entity.

(d) Prohibited Uses and Disclosures. Business Associate shall not use or disclose PHI in any manner that would constitute a violation of the Privacy Rule or the HITECH Act if so used or disclosed by Covered Entity.

(e) Appropriate Safeguards. Business Associate shall implement appropriate safeguards as necessary to prevent the use or disclosure of PHI otherwise than as permitted by the Agreement pursuant to which Business Associate performs services for Covered Entity or under this Business Associate Agreement, including but not limited to, administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the PHI, in accordance with 45 C.F.R. Sections 164.308, 164.310, and 164.312. Business Associate shall comply with the policies and procedures and documentation requirements of the HIPAA Security Rule, including but not limited to, 45 C.F.R. Section 164.316.

(f) Reporting Improper Access, Use or Disclosure. Business Associate shall report to Covered Entity in writing any access, use or disclosure of PHI not permitted by the Agreement pursuant to which Business Associate performs services for Covered Entity, or this Business Associate Agreement, and any Breach of Unsecured PHI of which it becomes aware without unreasonable delay and in no case later than 10 calendar days after discovery.

(g) Mitigation. Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of PHI held by Business Associate in violation of the requirements of this Agreement.

(h) Business Associate's Agents. Business Associate agrees to ensure that any agent, including a subcontractor, to whom it provides PHI received from, or created or received by Business Associate on behalf of Covered Entity agrees to the same restrictions and conditions that apply through this Agreement to Business Associate with respect to PHI.

(i) Access to PHI. Business Associate agrees, at the request of Covered Entity, to provide Covered Entity (or a designate of Covered Entity) access to PHI in a Designated Record Set in prompt commercially reasonable manner in order to meet the requirements under 45 CFR §164.524.

(j) Amendment of PHI. Business Associate agrees to make any amendment(s) to PHI in a Designated Record Set that the Covered Entity directs or agrees to pursuant to 45 CFR §164.526 at the request of Covered Entity or an Individual, in a prompt and commercially reasonable manner.

(k) Accounting Rights. Business Associate agrees to document such disclosures of PHI and information related to such disclosures as would be required for Covered Entity to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 CFR §164.528. Business Associate agrees to provide to Covered Entity or an Individual, in a prompt commercially reasonable manner, information collected in accordance with this Agreement, to permit Covered Entity to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 CFR §164.528.

(l) Compliance with HITECH Standards. Notwithstanding any other provision in this Agreement to the contrary, Business Associate shall, pursuant to the HITECH Act, comply with all applicable requirements of the Privacy Rule and applicable requirements of the Security Rule.

(m) Governmental Access to Records. Business Associate agrees to make internal practices, books, and records, including policies and procedures and PHI, relatin to the use and disclosure of PHI received from, or created or received by Business Associate on behalf of, Covered Entity available to the Covered Entity, or to the Secretary (including official representatives of the Secretary), in a prompt commercially reasonable manner for purposes of determining Covered Entity's compliance with the Privacy Rule.

(n) Data Ownership. Business Associate acknowledges that Business Associate has no ownership rights with respect to PHI.

(o) Notification of Breach. During the term of the Contract, Business Associate shall notify Covered Entity within 10 days of any suspected or actual breach of security, intrusion, or unauthorized use or disclosure of PHI of which Business Associate becomes aware.

Filed in District Court
State of Minnesota
10/12/2022 2:01 PM

(p) Audit and Inspection. Business Associate shall, upon request with reasonable notice, provide Covered Entity access to its premises for a review and demonstration of its internal practices and procedures relating to the use or disclosure of PHI and for safeguarding PHI.

7.3 Upon Covered Entity's knowledge of a material breach by Business Associate, Covered Entity may: (i) Provide an opportunity for Business Associate to cure the breach or end the violation and terminate this Agreement if Business Associate does not cure the breach within the time specified by Covered Entity; (ii) immediately terminate this Agreement; or (iii) Covered Entity shall report the violation to the Secretary.

7.4 Except as provided below, upon termination of this Contract, for any reason, Business Associate shall return or destroy all PHI received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity. This provision shall apply to PHI that is in the possession of subcontractors or agents of Business Associate. Business Associate shall retain no copies of the PHI.

In the event that Business Associate determines that returning or destroying the PHI is infeasible, Business Associate shall provide to Covered Entity notification of the conditions that make return or destruction infeasible. Upon notification to Covered Entity that return or destruction of PHI is infeasible, Business Associate shall extend the protections of this Agreement to such PHI and limit further uses and disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such PHI.

7.5 If state law applicable to the relationship between Business Associate and Covered Entity contains additional or more stringent requirements than federal law for Business Associates regarding any aspect of PHI privacy, then Business Associate agrees to comply with the higher standard contained in applicable state law.

- 8 -

F72418 Rev 5-2010

(Page 15 of 22)    CASE 0:22-cv-02718-MJD-TNL   Doc. 1-1   Filed 10/27/22   Page 30 of 46

62-CV-22-5535

To Katherine Frost    Page 5 of 11        2013-03-15 14.00.25 (GMT)              From Matthew Strong

Filed in District Court
State of Minnesota
10/12/2022 2:01 PM

You and We must sign two copies of the Contract before it goes into effect.

**BROKER**

Your appointment as a Broker and the terms of this Contract are accepted by You.

Name (please print)   Matthew F. Strong

Signature
X _____                    Date  3/15/13

**MINNESOTA LIFE INSURANCE COMPANY**

We approve and accept Your appointment as a Broker and the terms of this Contract.

Officer signature
X _____

Title  Sr. Vp Life Product Manufacturing     Date  3/18/13

F72418 Rev 5-2010

62-CV-22-5535

Filed in District Court
State of Minnesota
10/12/2022 2:01 PM

# EXHIBIT D

62-CV-22-5535

CASE 0:22-cv-02718-MJD-TNL   Doc. 1-1   Filed 10/27/22   Page 32 of 46

Filed in District Court
State of Minnesota
10/12/2022 2:01 PM

## Brokerage General Agency Contract
(Fixed Products)

**Minnesota Life Insurance Company** - A Securian Company
400 Robert Street North  ●  St. Paul, Minnesota 55101-2098

**MINNESOTA LIFE**

### Section 1.  AUTHORITY & ACTIVITIES

Minnesota Life Insurance Company (We, Us, Our) and the master brokerage general agent named on the signature page (Master Brokerage General Agent, MBGA) hereby contract with and agree to appoint the individual or entity named on the signature page (You, Your, BGA) as a brokerage general agent. This Brokerage General Agency Contract ("Contract") is effective on the date We determine, as indicated herein.

**1.1**  You are authorized:

  (a) To market Minnesota Life Insurance Company to brokers;

  (b) To recommend producers to be appointed as insurance agents with Us through the Master Brokerage General Agent. Such producers that are appointed by Us will be referred to hereinafter as "Your Brokers";

  (c) To solicit and procure applications for Our products that are not registered with the Securities and Exchange Commission ("SEC") as listed on any Brokerage General Agency Contract Update in effect and made a part of this Contract, but, in any state that requires appointment, Neither You nor Your Brokers may solicit an application for Our products before appointment by Us in that state;

  (d) To remit all applications and any initial premiums promptly to Us or as otherwise instructed by Us;

  (e) To deliver all issued products promptly to the contract owner in accordance with any delivery instructions;

  (f) To provide service to product owners of Our products;

  (g) To obtain and keep in good standing all appropriate licenses necessary to solicit applications as authorized under this Contract; and

  (h) To train and manage Your Brokers, and to promote and provide administrative assistance relating to Our products at Our request.

**1.2**  You shall perform the following activities:

  (a) Supervise, insofar as possible, Your Brokers to ensure that they:

    (1) Comply with the terms of their Broker Sales Contract with Us (See Broker Sales Contract attached as Schedule 1);

    (2) Promote Us or Our products by using only marketing materials that are approved by Us. For purposes of this provision, "marketing materials" means all written, and pictorial materials designed to reach the public (including but not limited to brochures, newsletters, letters, presentations, proposals, web pages, phone scripts, illustrations, business cards, letterhead, mailing or e-mailings) which contain Our signature package (logo), reference Us or Our products, or mention Our name; and

    (3) Comply with all applicable insurance laws and regulations governing the sale and servicing of Our products.

  (b) Review all applications before submitting them to Us or as otherwise instructed by Us and submit only those applications that have been properly completed and for which Your Broker has the licenses and appointments required by Us.

**1.3**  You acknowledge that you have been provided access to a copy of Our Policies and Procedures Guide, which we may amend from time to time and which can be found at https://lifecenter.minnesotalife.com/lc,  You agree to abide by our Policies and Procedures.

**1.4**  MBGA agrees to compensate You as provided in this Contract.

### Section 2.  COMPENSATION

**2.1**  YOUR COMPENSATION

  (a) As full compensation for all services rendered by You, MBGA agrees to pay You the remaining net compensation after the amounts You direct to be paid to Your Brokers have been subtracted from the gross compensation payable due to the sale of Our products by Your Brokers. Compensation will be paid as We receive premiums in cash and as directed by the MBGA, subject to Our established practices in effect at the time. We may pay compensation directly to You or to the broker-dealer with whom you are registered ("Your Broker-Dealer") if so required by Your Broker-Dealer. It is Your responsibility to inform Us in writing if Your compensation must be paid to

Your Broker-Dealer. Compensation paid to Your Broker-Dealer will be governed by agreements between Us and Your Broker-Dealer, and any such payment will be Your Broker-Dealer's sole responsibility. In all cases involving a dispute or questionable compensation claim, Our decision shall be binding and conclusive. For income and other tax reporting purposes, We will report all income paid directly to You under this Contract at the direction of the MBGA;

(b) Your compensation is explained in detail in the Brokerage General Agency Contract Update ("Contract Update") in Schedule 2, attached to and made a part of this Contract. We will facilitate this payment as directed by the MBGA and forward payment to You. You will be eligible for compensation for the sale of Our products where:

   (1) The application was submitted by Your Brokers;
   (2) The application has satisfied all of Our requirements;
   (3) The application was approved by Us; and
   (4) The products are identified by Us in Our compensation system as relating to You.

(c) MBGA will calculate compensation under this Contract according to the Contract Update in effect for You on the date the date compensation is to be first paid to You for a particular policy. The Contract Update in effect on the date that compensation is first paid for a policy shall apply to all compensation paid on that policy throughout the life of the policy. Whenever a new Contract Update is issued, it will become a part of this Contract. Except as expressly stated in each new Contract Update, the rates, schedules and other information in the new Contract Update will become effective during the first full calendar week following the issuance of the new Contract Update by the MBGA. We will either communicate it to You or post it on Our website accessible to You;

(d) We will pay all compensation which is due you under this Contract on and after the date of your death, to the duly appointed representative of your estate; and

(e) We have the right to refund any premiums paid on a policy if We believe this is proper where a policy is rescinded, cancelled, or not accepted, or for any other reason We believe is proper. You agree to return to Us, when We ask for it, all earnings which We credited to You on any premiums which We refund.

## 2.2  COMPENSATION AFTER TERMINATION

Should either MBGA, You, or We terminate this Contract, compensation for products in force after termination will be payable as follows:

(a) If You are terminated for reasons other than reasons that qualify as Prohibited Acts under paragraph 4.6(c), compensation as described in Section 2 will continue to be paid as if this Contract were still in force on products sold before termination by You. Notwithstanding the foregoing, if after Your termination You or individuals working at Your direction participate in the conduct described in paragraph 4.6(c)(1), 4.6(c)(4) or 4.6(c)(5), We, at Our option, may declare this Contract null and void, and all Your rights, benefits, and compensation (according to Section 2.1 YOUR COMPENSATION) shall be forfeited.

If termination is with cause and You have done any of the Prohibited Acts as defined in Section 4.6(c), We, at Our option, may declare this Contract null and void, and all Your rights, benefits, and compensation from Us (according to Section 2.1 YOUR COMPENSATION) shall be forfeited. You agree to return compensation You or Your Brokers received for cases where sections 4.6(c)(1) or (2) are violated and we have terminated Your contract for cause.

## 2.3  ADJUSTMENTS

(a) RETURNED PREMIUMS. All compensation paid to You or Your Brokers as provided in Section 2, on any premiums that are subsequently returned or otherwise not received by Us shall, upon Our demand, become a debt You owe to Us, payable according to paragraph 2.3(b) FIRST CLAIM ON EARNINGS; and

(b) FIRST CLAIM ON EARNINGS. You agree to promptly repay all debts to Us, including reasonable interest as We determine. We have first claim on all of Your earnings. This means that, as and when elected, We may keep all or any part

of Your earnings to reduce any debt You owe Us. While We may release Your earnings while You owe Us a debt, this does not mean We have waived this right of first claim to Your earnings. We may make this claim whether Your earnings are due You, the representative of Your estate, Your heirs or Your assignees. Our claim also takes precedence over claims of Your creditors. All Your earnings We keep will be used to reduce the debt you owe Us or the MBGA.

**Section 3.** BGA REPRESENTATIONS

You represent and agree for Yourself and Your Brokers:

**3.1** To abide by Our policies and procedures related to the solicitation of products listed in the Contract Update;

**3.2** To abide by any policies and procedures that We communicate;

**3.3** To review and become familiar with Our products prior to soliciting applications for such products; and

**3.4** To solicit, procure, and submit applications for products only if properly licensed and appointed to do so as required by Us and applicable laws.

**Section 4.** GENERAL PROVISIONS

**4.1** STATUS. You are not Our employee or the MBGA's employee under this Contract. You are an independent contractor using Your own judgment and guidelines in performing under the terms of this Contract. Only You shall determine the place or time that You perform Your duties as a BGA under this Contract, and nothing contained in this Contract shall limit Your right to sell products on behalf of other insurance companies. You are responsible for paying all expenses You incur in carrying out the terms of the Contract.
As a BGA, You are not a full-time salesperson for Us or the MBGA. Therefore You are not eligible for any fringe benefit plans in which Your participation or Our contributions are in any way dependent on Your being considered a statutory or common law employee. We will not pay any social security or related taxes on Your compensation.

**4.2** ACTS NOT AUTHORIZED. Your authority extends no further than is specifically stated in this Contract and, except as expressly set forth herein, You shall have no power or authority to act on Our behalf or to authorize Your Brokers

to act on Our behalf. Specifically, but not limited to the following, neither You nor Your Brokers are authorized:

(a) To offer for sale, in Our name, any products not included on the attached Contract Update. However, this shall not affect Your ability to sell products on behalf of other insurance companies. The Contract Update shall be amended without amending this Contract;

(b) To make, alter, or discharge contracts in Our name, or guarantee any illustrations;

(c) To incur any debt or liability for or against Us, institute any legal proceedings, or bind Us in any manner whatsoever;

(d) To accept any money or property on Our behalf, except for first premiums on Our products;

(e) To create or use any advertisement (all written and pictorial materials designed to reach the public, including but not limited to brochures, newsletters, letters, presentations, proposals, web pages, phone scripts, illustrations, business cards, letterhead, mailing or e-mailings) containing Our signature package (logo), referencing Us or Our products, or mentioning Our name unless (1) it has first been approved by Us in writing, and (2) a copy of the final version has been received by Our home office before it is used, and (3) it is used in accordance with any conditions and limitations of said approval;

(f) To incur any expense or liability on Our account without Our specific written authority to do so;

(g) To solicit, procure or submit applications for Our SEC registered products which are controlled by selling agreements between FINRA member broker dealers.

**4.3** FIDELITY BOND AND INDEMNITY AGREEMENT. Neither You nor Your Brokers are covered under Our fidelity bond. Notwithstanding any fidelity bond, You agree to indemnify and hold Us harmless against any damages or losses which We incurred as a result of Your actions or the actions of Your Brokers or employees.

**4.4** ERRORS AND OMISSIONS INSURANCE COVERAGE. Before soliciting applications for Us, You agree to provide written proof to Us of Your errors and omissions insurance coverage, of a form and type of coverage and an amount satisfactory to Us. You agree that this coverage

shall include You and Your applicable administrative staff. You further agree to keep this required insurance coverage in force and to provide Us periodic proof of said coverage for as long as You are appointed by Us.

**4.5** CLAIMS AGAINST YOU OR US. You agree to provide timely notice to Us and any applicable errors and omissions insurance carriers of any claim against Us, You, Your Brokers, or any individual working for You or on Your behalf where said claim is related to Your actions, the actions of Your Brokers or any individual working on your behalf and is related in any way to the sale of Our products. You agree to cooperate with these carriers. To the extent full coverage by any errors and omissions carriers is not extended to You, or individuals working for You or on Your behalf, Your Brokers, or to Us, We have the right to defend said claim, and settle that claim, when We receive satisfactory proof of the merit of that claim. You will be liable to Us and agree to reimburse Us fully for any payments made and any related expenses incurred by Us in the defense and settlement of any such claim that We defend, pay or settle, including costs of counsel employed for such action.

**4.6** TERMINATION. This Contract can be terminated either without cause or with cause.

(a) Without Cause. Your Contract can be terminated, without cause and without a reason being given, at any time by You, Master Brokerage General Agent, or Us. The party who wants to terminate this Contract without cause must give 15 days' written notice to the other parties to the Contract. This Contract will terminate as of 11:59 p.m. on the 15th day following the date on which the notice was given. Upon mutual written agreement of the parties, the 15 day notice period may be waived.

(b) With Cause. Your Contract can be terminated for cause at any time in Our sole discretion or in the MBGA's sole discretion. We or the MBGA must state the cause in writing to You. This Contract will terminate as soon as the written notice is given. Reasons may include, but are not limited to, Providing Us or encouraging a Broker or applicant to provide us with information in the application that You know is false, Your failure: to maintain a necessary license; to comply with an insurance or securities law or regulation; to comply with Our rules or procedures; to make suitable arrangements to repay a debt payable to Us, or to comply with a term of this Contract.

(c) Forfeiture. Except as otherwise provided by law, if (1) Your Contract is terminated for cause; and (2) You also do (or You cause or allow any individuals working for You or on Your behalf to do) any of the conduct listed below (the "Prohibited Acts"), We, at Our option, may declare this Contract null and void, and all Your rights, benefits, and compensation from Us or MBGA (according to Section 2.1 YOUR COMPENSATION) shall be forfeited:

(1) Withhold or misappropriate any funds, documents, or property belonging to an owner of one of Our products, or to a person whose application for a product has not been accepted by Us;

(2) Knowingly provide false information on the applicant's application;

(3) Provide false information in Your application to contract with Us;

(4) Induce any owner of one of Our products to lapse or surrender the product or replace it with another company's product without Our consent, whether or not applicable replacement laws or regulations have been followed;

(5) Induce or attempt to induce one of Our agents to leave Us; or

(6) Violate any state or federal insurance or securities law.

You agree to return compensation You or Your Brokers received for cases where clauses (1) or (2) above are violated and we have terminated Your contract for cause.

(d) Nothing herein shall affect Our right to assert any other claim, either in law or in equity, We may have or acquire against You.

(e) Termination of this Contract shall not affect Your obligation to repay any debt to Us or to account for and return all funds, products, training or sales material, and Our other property to Our satisfaction.

**4.7** ASSIGNMENT. We are relying on Your specific abilities in the performance of the obligations and duties under this Contract. Therefore, neither this Contract nor any of the rights, obligations or duties under this Contract may be assigned by You without Our prior written approval, which approval may be withheld in Our sole discretion.

**4.8** WAIVER. The failure of either party to exercise any right or enforce any provision of this Contract shall not be construed as a waiver of that party's right to subsequently exercise that right or enforce that provision.

(Page 14 of 27)

62-CV-22-5535

CASE 0:22-cv-02718-MJD-TNL   Doc. 1-1   Filed 10/27/22   Page 36 of 46

Filed in District Court
State of Minnesota
10/12/2022 2:01 PM

**4.9** AMENDMENT OF CONTRACT. We reserve the right to amend any part of this Contract upon notice to You. Any amendment will be effective thirty days from the communication of such amendment, or earlier by mutual written agreement, but no such amendment shall affect compensation payable on products previously put in force, except by mutual written agreement. Neither this Contract nor any amendment to it shall bind Us unless signed by Our officer. We, cooperating with the MBGA, and the MBGA reserve the right to change any part of the Contract Update at any time. The compensation calculations stated in any Contract Update, however, shall continue to apply until We or the MBGA communicates such changes to You or until they are posted on Our website accessible to You. Changes to the Contract Update shall be exempt from the officer signature and notice requirements.

**4.10** GOVERNING LAW. This Contract is governed by the laws of the State of of Minnesota. Any litigation arising between the parties with respect to this Contract shall be conducted in Ramsey County, Minnesota.

**4.11** ANTI-MONEY LAUNDERING. You shall comply and require Your Brokers to comply with Our anti-money laundering policy, and, if requested, You and Your Brokers shall assist in satisfying Our obligations under Our anti-money laundering policy.

**4.12** BROKERS. Your Brokers shall enter into a contract with Us on Our approved form and signed by Our officer. We can, in Our sole discretion, approve, reject, or terminate any such contract. Any such rejection or termination shall not create any liability from Us to You. You may request, at any time, that We terminate Your Broker(s). We will honor reasonable termination requests. Circumstances may develop so that Your Brokers may need to be reassigned to another master brokerage general agent. You shall grant Your consent to all reasonable reassignment requests. The parties shall cooperate when handling reassignment requests.

**4.13** JURISDICTION. We may make such changes and decisions as We deem advisable in the conduct of Our business, including but not limited to discontinuance of any policy form or withdrawal of product sales from any jurisdiction, and We shall incur no liability to You or Your Brokers by reason of doing so.

**4.14** EXHIBITS & SCHEDULES. The Exhibits and the Schedules to this Contract that are specifically referred to herein are a part of this Contract as if fully set forth herein. All references herein to Articles, Sections, subsections, paragraphs, subparagraphs, clauses, Exhibits and Schedules shall be deemed references to such parts of this Contract, unless the context shall otherwise require. Any fact or item disclosed on any Schedule to this Contract shall be deemed disclosed on all other Schedules to this Contract to which such fact or item may apply.

**4.15** SURVIVAL. The provisions of Sections 2.2, 2.3, 4.6, 4.12, 5, 6, and 7 shall survive a termination of this Contract.

**Section 5.** MAINTAINING CONFIDENTIALITY OF PERSONAL INFORMATION

All capitalized terms used in this section and not otherwise defined shall have the meanings set forth in regulations issued pursuant to Section 504 of the Gramm-Leach-Bliley Act (15 U.S.C. 6801 et. seq). In connection with Your performance under this Contract, You may have access to Nonpublic Personal Information concerning Our customers (Customer Information). With respect to Customer Information You agree as follows:

**5.1** Nonpublic Personal Information You acquire in connection with Your performance under this Contract is and remains Our property.

**5.2** You are not authorized to use or disclose Customer Information for any purpose other than to fulfill Your obligations under this Contract. However, You may disclose Customer Information (a) to employees of Minnesota Life, (b) to Your employees, subcontractors and agents who have a business need for access, (c) as authorized by Us in writing, and (d) as required by law or court order. You will notify Us promptly upon becoming aware of any such court order, and will cooperate with Us in contesting such order.

**5.3** You shall store Customer Information in a secure manner and shall use the same degree of care to prevent unauthorized and improper disclosure, as You use in protecting Your own confidential information.

**5.4** You agree and represent that You have implemented appropriate measures designed to:

    (a) Ensure the security and confidentiality of Customer Information;

    (b) Protect against any anticipated threats or hazards to the security or integrity of the information; and

(Page 15 of 27)

62-CV-22-5535

CASE 0:22-cv-02718-MJD-TNL   Doc. 1-1   Filed 10/27/22   Page 37 of 46

Filed in District Court
State of Minnesota
10/12/2022 2:01 PM

(c) Protect against unauthorized access to or use of the information that could result in substantial harm or inconvenience to any Minnesota Life customer.

**5.5** You agree to promptly notify Us if You, (a) receive any type of complaint or notice concerning violation of privacy rights, or (b) becomes aware of any unauthorized disclosure, acquisition or use of Customer Information. You shall cooperate with Us in investigating and responding to such incidents.

**5.6** You agree to indemnify us for any and all claims, fines, damages and costs, including attorneys' fees, which may be incurred or assessed against Us as a result of breach of Your obligation of confidentiality.

**5.7** Your obligation to maintain the security and confidentiality of Our Customer Information and to comply with the provisions of the Gramm-Leach-Bliley act shall survive termination of Your relationship with Minnesota Life.

**5.8** We shall have the right to audit You for compliance with the provisions of this Section.

**Section 6.** MASSACHUSETTS DATA SECURITY LAW

In connection with Your performance under this Contract, You may have access to Personal Information as that term is defined in Massachusetts Regulation 201 CMR 17.02. As required by 201 CMR 17:00: Standards for the Protection of Personal Information of Residents of the Commonwealth, You shall implement and maintain appropriate security measures for Personal Information.

**Section 7.** HIPAA BUSINESS ASSOCIATE AGREEMENT

In connection with Your performance under this Contract, You are or may be deemed to be our Business Associate. Business Associates, on behalf of Covered Entity, perform or assist in the performance of functions and activities that may involve the use and disclosure of Protected Health Information as defined in the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Parts 160 and 164 ("Privacy Regulations"). This Agreement shall be effective with respect to the use of information which is protected health information within the meaning of the Health Insurance Portability and Accountability Act and its implementing regulations at 45 C.F.R. parts 160 and 164 (the "Federal Health Privacy Rules").

**7.1** Definitions as applied to this Section (Any prospective amendment to the laws referenced in this definitional section prospectively amend this agreement to incorporate said changes by Congressional act or by regulation of the Secretary of HHS.)

(a) Breach. "Breach" has the same meaning as this term has in §13400 of the HITECH Act.

(b) Business Associate. "Business Associate" shall mean You.

(c) Covered Entity. "Covered Entity" shall mean Minnesota Life Insurance Company.

(d) Designated Record Set. "Designated Record Set" has the same meaning as this term has in 45 CFR §164.501.

(e) Electronic Protected Health Information. "Electronic Protected Health Information" means Protected Health Information that is maintained in or transmitted by electronic media.

(f) Electronic Health Record. "Electronic Health Record" shall have the meaning given to such term in the HITECH Act.

(g) Individual. "Individual" has the same meaning as this term has in 45 CFR §164.501.

(h) Privacy Rule. "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 CFR Part 160 and Part 164, Subparts A and E., as amended by the HITECH Act.

(i) Protected Health Information. "Protected Health Information" (or "PHI") has the same meaning as this term has in 45 CFR §160.103 (as amended by the HITECH Act), limited to the information created or received by Business Associate from or on behalf of Covered Entity. Protected Health Information includes Electronic Protected Health Information.

(j) Required By Law. "Required By Law" has the same meaning as this term has in 45 CFR §164.501.

(k) Secretary. "Secretary" shall mean the Secretary of the U.S. Department of Health and Human Services or his designate.

(l) Security Rule. "Security Rule" means the Security Standards for Protection of Personal Health Information promulgated by the Secretary in Title 45 C.F.R.

(m) Unsecured Protected Health Information. "Unsecured Protected Health Information" shall mean Protected Health Information (PHI) that is not secured through the use of a technology or methodology specified by the Secretary in regulations or as otherwise defined in the §13402(h) of the HITECH Act.

Filed in District Court
State of Minnesota
10/12/2022 2:01 PM

**7.2** Obligations of Business Associate

(a) Permitted Uses and Disclosures. Business Associate agrees not to use or disclose PHI except for the performance of the Business Associate's obligations under the Agreement pursuant to which Business Associate performs services for Covered Entity.

(b) Minimum Necessary. Business Associate (and its agents or subcontractors) shall request, use and disclose only the minimum amount of PHI necessary to accomplish the purpose of the request, use or disclosure.

(c) Specific Use or Disclosure. Business Associate may use or disclose PHI to perform functions, activities, or services for, or on behalf of, Covered Entity and as permitted or required by this Agreement or the Privacy Regulations.

Business Associate may use or disclose PHI for the proper management and administration of its business or to carry out its legal responsibilities.

Business Associate may disclose PHI for the proper management and administration of its business, if (i.) the disclosures are Required by Law, or (ii.) Business Associate obtains reasonable assurances from the person to whom the information is disclosed that the information will be held confidentially and will be used or further disclosed only as required by law or for the purpose for which it was disclosed to such person, and the person will notify the Business Associate of any instances of which the person is aware in which the confidentiality of the information has been breached.

Business Associate may use PHI to provide Data Aggregation services to Covered Entity.

(d) Prohibited Uses and Disclosures. Business Associate shall not use or disclose PHI in any manner that would constitute a violation of the Privacy Rule or the HITECH Act if so used or disclosed by Covered Entity.

(e) Appropriate Safeguards. Business Associate shall implement appropriate safeguards as necessary to prevent the use or disclosure of PHI otherwise than as permitted by the Agreement pursuant to which Business Associate performs services for Covered Entity or under this Business Associate Agreement, including but not limited to, administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of the PHI, in accordance with 45 C.F.R. Sections 164.308, 164.310, and 164.312. Business Associate shall comply with the policies and procedures and documentation requirements of the HIPAA Security Rule, including but not limited to, 45 C.F.R. Section 164.316.

(f) Reporting Improper Access, Use or Disclosure. Business Associate shall report to Covered Entity in writing any access, use or disclosure of PHI not permitted by the Agreement pursuant to which Business Associate performs services for Covered Entity, or this Business Associate Agreement, and any Breach of Unsecured PHI of which it becomes aware without unreasonable delay and in no case later than 10 calendar days after discovery.

(g) Mitigation. Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of PHI held by Business Associate in violation of the requirements of this Agreement.

(h) Business Associate's Agents. Business Associate agrees to ensure that any agent, including a subcontractor, to whom it provides PHI received from, or created or received by Business Associate on behalf of Covered Entity agrees to the same restrictions and conditions that apply through this Agreement to Business Associate with respect to PHI.

(i) Access to PHI. Business Associate agrees, at the request of Covered Entity, to provide Covered Entity (or a designate of Covered Entity) access to PHI in a Designated Record Set in prompt commercially reasonable manner in order to meet the requirements under 45 CFR §164.524.

(j) Amendment of PHI. Business Associate agrees to make any amendment(s) to PHI in a Designated Record Set that the Covered Entity directs or agrees to pursuant to 45 CFR §164.526 at the request of Covered Entity or an Individual, in a prompt and commercially reasonable manner.

(Page 17 of 27)

62-CV-22-5535

CASE 0:22-cv-02718-MJD-TNL   Doc. 1-1   Filed 10/27/22   Page 39 of 46

Filed in District Court
State of Minnesota
10/12/2022 2:01 PM

(k) Accounting Rights. Business Associate agrees to document such disclosures of PHI and information related to such disclosures as would be required for Covered Entity to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 CFR §164.528. Business Associate agrees to provide to Covered Entity or an Individual, in a prompt commercially reasonable manner, information collected in accordance with this Agreement, to permit Covered Entity to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 CFR §164.528.

(l) Compliance with HITECH Standards. Notwithstanding any other provision in this Agreement to the contrary, Business Associate shall, pursuant to the HITECH Act, comply with all applicable requirements of the Privacy Rule and applicable requirements of the Security Rule.

(m) Governmental Access to Records. Business Associate agrees to make internal practices, books, and records, including policies and procedures and PHI, relating to the use and disclosure of PHI received from, or created or received by Business Associate on behalf of, Covered Entity available to the Covered Entity, or to the Secretary (including official representatives of the Secretary), in a prompt commercially reasonable manner for purposes of determining Covered Entity's compliance with the Privacy Rule.

(n) Data Ownership. Business Associate acknowledges that Business Associate has no ownership rights with respect to PHI.

(o) Notification of Breach. During the term of the Contract, Business Associate shall notify Covered Entity within 10 days of any suspected or actual breach of security, intrusion, or unauthorized use or disclosure of PHI of which Business Associate becomes aware.

(p) Audit and Inspection. Business Associate shall, upon request with reasonable notice, provide Covered Entity access to its premises for a review and demonstration of its internal practices and procedures relating to the use or disclosure of PHI and for safeguarding PHI.

**7.3** Upon Covered Entity's knowledge of a material breach by Business Associate, Covered Entity may: (i) Provide an opportunity for Business Associate to cure the breach or end the violation and terminate this Agreement if Business Associate does not cure the breach within the time specified by Covered Entity; (ii) immediately terminate this Agreement; or (iii) Covered Entity shall report the violation to the Secretary.

**7.4** Except as provided below, upon termination of this Contract, for any reason, Business Associate shall return or destroy all PHI received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity. This provision shall apply to PHI that is in the possession of subcontractors or agents of Business Associate. Business Associate shall retain no copies of the PHI.

In the event that Business Associate determines that returning or destroying the PHI is infeasible, Business Associate shall provide to Covered Entity notification of the conditions that make return or destruction infeasible. Upon notification to Covered Entity that return or destruction of PHI is infeasible, Business Associate shall extend the protections of this Agreement to such PHI and limit further uses and disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such PHI.

**7.5** If state law applicable to the relationship between Business Associate and Covered Entity contains additional or more stringent requirements than federal law for Business Associates regarding any aspect of PHI privacy, then Business Associate agrees to comply with the higher standard contained in applicable state law.

You, We, and the MBGA must sign three copies of the Contract before it goes into effect.

**BROKERAGE GENERAL AGENT**

Your appointment as a Brokerage General Agent and the terms of this Contract are accepted by You.

| Name (please print) | Matthew F. Strong / Strong Financial Solutions, Inc. | |
|---|---|---|
| Signature X | President | Date 1/13/14 |

**MINNESOTA LIFE INSURANCE COMPANY**

We approve and accept Your appointment as a Brokerage General Agent and the terms of this Contract.

| Officer signature X | | |
|---|---|---|
| Title 2nd VP | | Date 1/16/14 |

**MASTER BROKERAGE GENERAL AGENT**

Master Brokerage General Agent approves and accepts Your appointment as a Brokerage General Agent and the terms of this Contract.

| Name (please print) | PAUL S. THOMAS | |
|---|---|---|
| Title | | Date 1/14/14 |

– 9 –

F72419 Rev 5-2010

Filed in District Court
State of Minnesota
10/12/2022 2:01 PM

# **EXHIBIT E**

**Securian Financial Group, Inc.**
400 Robert Street North
St. Paul, MN  55101-2098
651-665-3500

securian.com

**securian** FINANCIAL

12/31/21

STRONG FINANCIAL SOLUTIONS INC.
MATTHEW F STRONG
7047 E GREENWAY PARKWAY, SUITE 250
SCOTTSDALE AZ 85254

Re:  Debt to Minnesota Life Insurance Company

Dear MATTHEW F STRONG,

As stated in the letter dated 8/6/21, your Minnesota Life commission statement reflects a negative balance. Since then, your debt balance has increased to ($267,536.80). In accordance with your contract on file, you agreed to repay Minnesota Life in the event that policy activity creates a debt balance.  Enclosed you will find a statement which reflects the most current debt amount.

Minnesota Life requests immediate payment of all outstanding debts. If we do not receive a payment from you in the amount of $267,536.80 or a commitment to an acceptable payment plan, within thirty (30) business days from the date of this letter, Minnesota Life **will** be forced to consider additional collection procedures.  If forced to pursue additional collection procedures, Minnesota Life will, to the extent possible, seek reimbursement of the costs and expenses (including attorney fees) incurred in the course of collection, as well as interest. In addition, any active appointments with Minnesota Life will be terminated and the debt will be reported to Vector.

To satisfy your obligation to Minnesota Life, please send a check to my attention at the following address:

Minnesota Life Insurance
Attn:  Nancy Karl and Miranda Janssen
Station A6-6950
400 Robert Street North
St. Paul, MN  55101-2098

Please call me at 651-665-6417 if you have questions related to this matter.

Sincerely,

Nancy Karl
Minnesota Life Compensation Specialist

Cc: PEAK PERFORMANCE BROKERAGE - GABRIEL L MYERS

Securian Financial is the marketing name for Securian Financial Group, Inc. and its affiliates. Insurance products are issued by its affiliated insurance companies. Securities and investment advisory services offered through Securian Financial Services, Inc., registered investment advisor, member FINRA/S PC.
F62483  Rev 4-2018

Filed in District Court
State of Minnesota
10/12/2022 2:01 PM

# EXHIBIT F



Filed in District Court
State of Minnesota
10/12/2022 2:01 PM

**LPM Commission Statement**

Week Ending May 06, 2022

STRONG FINANCIAL SOLUTIONS INC.
2598 E SUNRISE BLVD
SUITE 2104
FORT LAUDERDALE, FL 33304

400 Robert Street North
St. Paul, MN 55101-2098

Minnesota Life (ML)

| Transactions | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Producer | Code | Product Name | Policy Number | Insured | Earned Premium | Payment Description | Issue Date | Rate | Split | Commission Amount |
| **SANDY OBRYAN MORRIS** | **6036265** | | | | | | | | | |
| BRIAN KEITH HARNER | 6037310 | Omega Builder | 2754682W | HARNER, ZACHARY W | $ 100.00 | Renewal Year Excess | 11/01/2015 | 0.0000% | 100.00 % | $ 0.00 |
| | | | | | | Sub-total: | | | | $ 0.00 |
| | | | | | | BGA Sub-total: | | | | $ 0.00 |
| | | | | | | Company: Minnesota Life (ML) Total: | | | | $ 0.00 |

Statement # 16519464121790000

**LPM Commission Statement**
CASE 0:22-cv-02718-MJD-TNL   Doc. 1-1   Filed 10/27/22   Page 45 of 46
Week Ending May 06, 2022
62-CV-22-5535

**STRONG FINANCIAL SOLUTIONS INC**
State of Minnesota
10/12/2022 2:01 PM

Filed in District Court

## SUMMARY

### Summary Totals

**Minnesota Life (ML)**

| | |
|---|---|
| Beginning Balance Forward: | -$ 267,500.08 |
| Commission Activity: | $ 0.00 |
| Total Commission: | $ 0.00 |
| | |
| Commission Paid: | $ 0.00 |
| Ending Balance Forward: | -$ 267,500.08 |

YEAR TO DATE

| | |
|---|---|
| Commission Paid: | $ 36.72 |

Filed in District Court
State of Minnesota
10/12/2022 2:0?PM

Document # 1651946412179000

STRONG FINANCIAL SOLUTIONS INC.
2598 E SUNRISE BLVD
SUITE 2104
FORT LAUDERDALE, FL 33304